# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SOUTHLAND ROYALTY COMPANY LLC, | ) | Case No. 20-10158 (KBO) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| SOUTHLAND ROYALTY COMPANY LLC, | ) | |
| | ) | Adv. Proc. No. 20-50551 (KBO) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WAMSUTTER LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION[1]

## I.      INTRODUCTION

The above-captioned adversary proceeding springs from a gas gathering agreement, referred to as the L63 Agreement, between plaintiff-debtor Southland Royalty Company LLC ("Southland") and defendant Wamsutter LLC ("Wamsutter") pertaining to Southland's assets in the Wamsutter field of the Greater Green River Basin of southwestern Wyoming.  Following the commencement of Southland's chapter 11 bankruptcy proceeding, Southland began a sale process for such assets but suspended it after receiving no binding offers.  Attributing this lack of success to a burdensome minimum volume commitment and associated deficiency fees contained in the L63 Agreement, Southland commenced this action to gain clarity as to its options with respect to the agreement so that it can move forward with its bankruptcy proceeding and maximize value for its stakeholders.[2]

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.  This Court has jurisdiction over these matters, which are core proceedings, pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A), (N) and (O).

[2] Following the commencement of this proceeding, the Court permitted the intervention of the Official Committee of Unsecured Creditors formed in Southland's bankruptcy proceeding (the "Committee").  Additionally, shortly before the start of trial, the Court allowed the intervention of Citibank, N.A. ("Citibank").  Southland, as borrower, is a party to a credit agreement (as amended and modified, the "Prepetition RBL Credit Agreement") executed in 2015 with Citibank, as administrative agent, and fifteen

More specifically, Southland seeks to determine (1) whether it can eliminate the minimum volume commitment from the L63 Agreement so that the remainder of its terms may be assumed and assigned, (2) whether under section 363(f)[3] it may sell its assets free and clear of any interests that Wamsutter has as a result of the L63 Agreement, and (3) whether it may reject the L63 Agreement and flow all of its gas currently serviced by Wamsutter under such agreement to an earlier, less onerous gas gathering agreement between the parties referred to as the L60 Agreement. A threshold determination for the Court in deciding these issues is whether the L63 Agreement is in whole or in part a real covenant binding Southland's successors under Wyoming law as either a covenant running with the land or an equitable servitude. The Court finds that the L63 Agreement is not and does not contain a real covenant. This and the remainder of the issues presented by the parties are addressed more thoroughly herein.

## II.    FACTS

### A.    *The Parties*

On January 27, 2020 (the "Petition Date"), Southland filed a voluntary petition under chapter 11 of the Bankruptcy Code. Southland is an upstream energy company focused on the acquisition, development, and exploitation of oil, natural gas, and natural gas liquid reserves in North America. Southland owns interests in thousands of operated and non-operated oil and gas wells covering more than 500,000 net working interest acres in the Wamsutter field of the Greater Green River Basin in Carbon and Sweetwater County, Wyoming (the "Wamsutter Field"). Southland acquired its interests in the Wamsutter Field from Anadarko E&P Onshore LLC, Anadarko Land Corp., and Kerr-McGee Oil and Gas Onshore, LP (together, "Anadarko") in a transaction that closed on June 24, 2016.[4]

Wamsutter[5] is a provider of midstream services to Southland in the Wamsutter Field pursuant to various agreements. To provide its services, it constructed and owns a gathering system in the Wamsutter Field (the "Wamsutter Gathering System"). The Wamsutter Gathering

---

financial institutions as lenders (together with Citibank, the "RBL Lenders"). As of the Petition Date, Southland owed the RBL Lenders an aggregate principal amount of approximately $540 million. In connection with the approval of its debtor-in-possession financing, Southland stipulated to, among other things, the validity, priority, nature, extent, and perfection of the RBL Lenders' purported mortgages, liens, security interests, and other claimed interests in Southland's property arising from the lending relationship. *See* No. 20-10158 ("Bankr.") D.I. 188 at 7-11. On August 28, 2020, the Committee commenced a limited challenge to the stipulations. *See* Adv. Proc. No. 20-50835 D.I. 1 (*Complaint for Avoidance and Related Declaratory Relief and Objection to Certain Debtor RBL Stipulations*). The Committee's action is not relevant to this proceeding.

[3] Unless otherwise indicated, all statutory references herein refer to title 11 of the United States Code (the "Bankruptcy Code").

[4] *See* Ex. 29.

[5] Wamsutter is an indirect subsidiary of The Williams Companies, Inc. ("Williams"). As explained by a representative of Williams, Wamsutter owns the Wamsutter Gathering System (as defined herein) and Williams operates it. The parties have referred to Williams and Wamsutter interchangeably. Moreover, the Gas Gathering Agreements define and refer to Wamsutter as Williams.

System is a large highway of pipes, compressors, dehydrators, processing plants, and other facilities that enable Wamsutter to gather, transport, process, and treat the gas produced from Southland's wells so that it can be taken downstream for sale. As it currently stands, the Wamsutter Gathering System is comprised of, among other things, thousands of miles of pipelines, numerous gas compressor stations, and a gas processing plant. Infrastructure, facilities, and services of the kind Wamsutter provides are critical to upstream producers such as Southland who do not own or otherwise have access to such provisions, and are therefore reliant on third parties to monetize the gas produced from their wells.

At issue in this dispute are two gas gathering agreements between Southland and Wamsutter governed by Wyoming law. The first is dated June 1, 2016 and entitled *Gas Gathering, Processing, Dehydrating and Treating Agreement* (the "L60 Agreement"). The second is effective November 1, 2018 and also entitled *Gas Gathering, Processing, Dehydrating and Treating Agreement* (the "L63 Agreement" and, together with the L60 Agreement, the "Gas Gathering Agreements").

## B.     *The L60 Agreement*

Wamsutter and Anadarko E&P Onshore, LLC entered into the L60 Agreement shortly before the Anadarko-Southland sale. At that time, the agreement was known as the L09 Agreement. The L09 Agreement served in part to update and replace gas gathering agreements in place between the parties since 1993. The execution of the agreement followed months of negotiations between Anadarko and Wamsutter. Towards the end of the negotiations, Southland became involved. Following the Anadarko-Southland sale, the L09 Agreement was partially assigned to Southland and renamed the L60 Agreement.[6] The primary term of the L60 Agreement expires on December 31, 2031.

In the L60 Agreement, Southland dedicated (the "L60 Dedication") its gas within a specified geographic area of the Wamsutter Field (the "L60 Area of Interest") for Wamsutter's exclusive right to gather, process, dehydrate, and treat.[7] Wamsutter agreed to gather Southland's gas at certain specified locations within the L60 Area of Interest called receipt points (the "L60 Receipt Points") and to process it in exchange for the payment of volumetric gathering and processing fees.[8] At the time of contracting, the parties agreed on a defined set of L60 Receipt

---

[6] *See* Ex. 95.

[7] Ex. 62 § 1.1 ("Shipper dedicates Shipper's Gas within the Area of Interest . . . to Williams for Gathering, Processing, Dehydrating and Treating.").

[8] Section 1.2 of the L60 Agreement provides that "Williams shall Gather and Process . . . quantities of Shipper's Gas less than or equal to the maximum daily quantity . . . . Shipper shall pay the Gathering Fee and Processing Fee . . . ." *Id.* § 1.2. "Shipper's Gas" is defined as "all of the Gas that Shipper owns or controls during the term of [the L60] Agreement that is produced upstream of the Receipt Points shown on Exhibit C and all Gas that Shipper owns or controls during the term of this Agreement that is within the Area of Interest . . . ." *Id.*, Ex. A at 4. "Gas" is defined as "a naturally occurring mixture of hydrocarbon compounds and small quantities of various non-hydrocarbons existing in the gaseous phase or in solution with crude oil in natural underground reservoirs at reservoir conditions." *Id.*, Ex. A at 2.

Points corresponding to existing wells.[9]  They also agreed on procedures for future drilled wells. For example, if Southland plans to drill an additional well in the L60 Area of Interest, it must deliver notice to Wamsutter of, among other things, the well's location and a reasonable estimate of its production and gas quality.  Wamsutter must then accept or reject the new well.  If accepted, the L60 Agreement is automatically amended to include the new well within the L60 Dedication and to identify the new L60 Receipt Point for the well.  If rejected, the new well and the gas produced therefrom are removed from the L60 Dedication and Southland is free to contract with a new midstream provider.[10]  A similar procedure applies to future gas acquired by Southland within the L60 Area of Interest.[11]

## C.     *The Chain Lake Amendment*

Wamsutter and Southland amended the L60 Agreement multiple times, including on September 1, 2017 (the "Chain Lake Amendment").[12]  As discussed further herein, Southland desired to increase its horizontal drilling activities in the L60 Area of Interest.  Because the then-existing Wamsutter Gathering System was designed to accommodate vertical wells, it was determined that modifications were needed to provide incremental capacity to accommodate Southland's future horizontal wells.  Horizontal wells typically produce gas at a much higher volume than vertical wells.  As a result, if not updated, a gathering system servicing vertical wells may be incapable of handling the additional volume from horizontal wells.  The resulting increased pressure on the system could reduce or completely stop production from the vertical wells.

To address these potential problems, Wamsutter agreed in the Chain Lake Amendment to enhance certain components of the Wamsutter Gathering System, including the installation of a new compressor station and several larger pipelines.  To compensate Wamsutter for its services and investment undertaken by this project, Southland and Wamsutter negotiated a comprehensive fee structure in which Southland agreed to pay a project volumetric fee, a one-time payment of $5 million, and deficiency fees calculated on an annual basis if Southland failed to deliver to Wamsutter certain agreed-upon minimum volumes of gas during a ten-year period.[13]  Additionally, Southland and Wamsutter agreed that certain existing receipt points in an overlapping dedicated area of interest established by a separate gathering agreement, referred to as the G36 Agreement, would be removed and added to the L60 Agreement.[14]

## D.     *The L63 Agreement*

At the time of the Anadarko-Southland sale, most of the producing wells in the L60 Area of Interest were traditional vertical wells.  Thereafter, Southland developed its extensive horizontal

---

[9] *See id.*, Ex. A at 3 (definition of "Receipt Point") & Ex. C.

[10] *Id* § 2.3.

[11] *Id* § 2.4.

[12] Ex. 156.

[13] *Id.* § 1.

[14] *Id.* §§ E & 2.

drilling program. Southland envisioned hundreds of future horizontal wells and significant forecasted production. As a result, Wamsutter needed to further expand, at great cost, the Wamsutter Gathering System by designing and constructing tailored infrastructure, including two compressor stations called the Hansen Lake Compressor Station and the High Point Compressor Station as well as associated pipelines and equipment (the "Hansen Lake/High Point Infrastructure"). Other producers in the Wamsutter Field may use some of the Wamsutter Gathering System, but only Southland uses the Hansen Lake/High Point Infrastructure.

To accommodate this major project and Wamsutter's approximate $350 million investment, the parties entered into the L63 Agreement. Negotiations began in 2017. The parties signed in June 2018 and made the agreement effective November 1, 2018. The primary term of the L63 Agreement expires on October 1, 2038. On January 8, 2020, Wamsutter recorded in the real property records of Carbon and Sweetwater Counties, Wyoming the *Memorandum of Gas Gathering Processing, Dehydrating and Treating Agreement* (the "L63 Memorandum") to provide notice of the L63 Agreement and its terms.[15]

Among the key terms of the L63 Agreement extensively negotiated were those governing Wamsutter's compensation for its capital investment on account of the Hansen Lake/High Point Infrastructure and for its ongoing gathering and processing services. Although there were multiple avenues by which to design a fee structure, the parties agreed that Wamsutter would receive volumetric gathering and processing fees (the "L63 G&P Fees") and deficiency fees billed on a quarterly basis (the "L63 MVC Fees") if Southland failed to deliver to Wamsutter certain agreed-upon minimum volumes of gas. Wamsutter suggested this structure, but it was open to considering alternatives. Rather than suggesting alternatives, Southland focused its time on achieving an acceptable balance between the fees, negotiating the terms of the minimum volume commitment (the "L63 MVC"), and ensuring that the fees aligned with its development plan and the risk undertaken by both parties.[16]

The parties engaged in months of back-and-forth, "significant"[17] negotiations. During such time, they exchanged information relevant to, among other things, the terms of the L63 MVC. The information included Southland's drilling plan and forecasted volumes and Wamsutter's project plan and capital estimates. Ultimately, the parties settled on their terms and entered into the L63 Agreement after obtaining their respective Board's approval to do so.[18]

---

[15] Ex. 371 & 372.

[16] For instance, Southland requested and obtained a more flexible L63 MVC schedule to accommodate its production forecast, it negotiated the L63 MVC settlement period so that it was quarterly (as opposed to monthly), it ensured that there were no limits on its ability to make-up L63 MVC shortfalls over the length of the agreement (as opposed to a two-year limit), and it requested and obtained the ability to reduce or satisfy the L63 MVC through a lump sum payment mechanism.

[17] Adv. D.I. 958 (Sept. 21, 2020 Tr. at 171:16-18).

[18] The L63 Agreement was a good faith, arms-length transaction between two sophisticated commercial parties, who are experts in the industry, with the goal to accommodate Southland's new horizontal drilling plan on mutually agreeable terms and with an acceptable risk profile. Its terms were heavily negotiated over a significant period, with a significant exchange of material information used to verify the project economics and to support the parties' understanding and acceptance of terms. There is no evidence that

The L63 Agreement contains a dedication (the "<u>L63 Dedication</u>"), with a geographic area that is subsumed within the L60 Area of Interest (the "<u>L63 Area of Interest</u>"). It provides:

> Except as expressly provided in Section 1.1(b), Shipper dedicates to the performance of this Agreement the Dedicated Properties and Dedicated Gas and grants to Williams the exclusive right to Gather, Process, Dehydrate and Treat the Produced Dedicated Gas (the "Dedication"). This Dedication shall be a covenant running with the land under applicable law and binding on the respective successors and assigns of the interests of Shipper and its Affiliates in and to the Dedicated Properties and Dedicated Gas. If applicable law requires any amendment or modification to this Agreement for this Dedication to be treated as an enforceable covenant running with the land, the parties will promptly enter into any such addendum or modification. Gatherer may file memoranda of this Agreement substantially in the form of Exhibit "J" in local land records from time to time in its discretion, and Shipper will promptly enter into any such memoranda upon request.[19]

Because the L60 Dedication and the L63 Dedication gave rise to an overlapping area of interest (the "<u>Overlapping Area of Interest</u>"), the L63 Agreement gave Southland a one-time election to flow gas produced from the Overlapping Area of Interest under the terms of either Gas

---

indicates the parties did not understand the benefits, obligations, and overall commercial significance of the L63 Agreement, including the fees thereunder.

With full knowledge of Southland's substantial commitment to L63 MVC and L63 MVC Fees, Southland's Board of Managers unanimously approved the L63 Agreement having determined it was "advisable and in the best interest of the Company[.]" Ex. 235 at 1. Indeed, even Mr. Casey, a representative responsible for negotiating and managing the L63 Agreement on behalf of Southland, testified that he knew, and understood that the Southland Board knew, the "significant risk" of agreeing to the L63 MVC, but that the Board ultimately approved it as agreed upon by the parties. Adv. D.I. 195 (Declaration of Frank Casey (the "<u>Casey Declaration</u>")) at ¶ 25. In doing so, it relied on Southland's production profile used to design the Hansen Lake/High Point Infrastructure and "became comfortable that it was possible [for Southland] to meet this production projection" and thus, the L63 MVC. *Id.* at ¶ 26. Despite the foregoing, Southland continued to negotiate with Wamsutter and obtain modifications to the L63 MVC "to help ensure it could meet the MVC during the initial years given the uncertainty of many factors when starting a new drilling program in an area where few horizontal wells had been drilled before." *Id.* at ¶ 27. Mr. Casey testified that in negotiating the L63 Agreement he believes that he acted as a reasonably prudent person would act under similar circumstances, in good faith, and in the best interests of Southland. Ultimately, at the time of contracting, Southland concluded that the L63 Agreement was its "best option, based on what [it] thought [it] knew at the time and [Southland's] desire to develop the asset more fully and to execute on [its] drilling plan" Adv. D.I. 958 (Sept. 21, 2020 Tr. at 190:22-24).

The problem that has arisen now is that Wamsutter is attempting to have the L63 MVC run with the land, a scenario that was not contemplated by the parties at the time of contracting and one which would fundamentally alter the ramifications of the L63 MVC.

[19] Ex. 258 § 1.1(a).

Gathering Agreement.[20]  Southland ultimately elected to move five existing wells then governed by the L60 Agreement to the L63 Agreement, and the parties moved the corresponding L60 Receipt Points to the L63 Agreement.[21]  With respect to gas produced from future wells drilled in the L63 Area of Interest, Southland was able to elect the application of either the L63 Agreement or the L60 Agreement upon appropriate notice to Wamsutter.[22]  To date, there are approximately twenty-one Receipt Points governed by the L63 Agreement in the L63 Area of Interest (the "L63 Receipt Points").[23]

The evidence suggests that the relationship between Wamsutter and Southland was a collaborative partnership before, during, and after negotiating and finalizing the L63 Agreement. The multi-year construction of the Hansen Lake/High Point Infrastructure project continued until the fourth quarter of 2019 when Southland sent notice to Wamsutter to cease construction because of changes to its drilling plan.[24]  More specifically, Southland decided to slow its development plan in light of reduced drilling economics and the tightening of available capital caused by, among other things, declines in commodity prices, underperforming well production, and unanticipated operational challenges.  In the notice, Southland instructed Wamsutter to make no further capital expenditures unless approved in writing by Southland and to provide an updated schedule of actual capital expenditures to facilitate good faith negotiations for modification of the L63 Agreement. In particular, Southland was interested in re-aligning the L63 MVC based on a new project scope and reduced capital expenditures.[25]  The parties met thereafter but were not able to agree on a restructuring of the L63 Agreement.[26]

The parties assert that the estimated range of the net present value of the L63 MVC Fees is at a minimum $413 million to $568 million, assuming a discount rate of ten percent and relying upon the forecasted production of Southland's proved developed producing reserves.

### E.    *Sale Process*

After the Petition Date, Southland commenced a sale process for substantially all of its assets.  In addition to those associated with its business in the Wamsutter Field (the "Wamsutter Assets"), Southland also owned assets, including leasehold and mineral interests, in the San Juan

---

[20] *Id.* § 1.1(c).

[21] Ex. 257 (November 1, 2018 amendment, removing certain receipt points from the L60 Agreement and adding them as receipt points under the L63 Agreement).

[22] Ex. 258 §§ 1.1(c) & 2.3.

[23] *See, e.g.*, Ex. 326 & 498.  Four of the twenty-one alleged L63 Receipt Points may be fuel gas meters, also known as buy back meters.  *See* Ex. 258 § 2.10.  These are delivery points that allow Wamsutter to deliver gas back to Southland for its own use.  A decision on the nature of the meters is not necessary to matters sub judice.

[24] Ex. 324; *see also* Ex. 258 § 1.2(d) (setting forth the procedure for ceasing or altering project work and modifying the commercial terms of the L63 Agreement).

[25] Ex. 324.

[26] Moreover, the parties have been engaged in mediation since the middle of July 2020 with no success. *See* Adv. Proc. No. 20-50551 ("Adv.") D.I. 77.

Basin in southwestern Colorado and northwestern New Mexico (the "San Juan Assets").[27] To assist in the process, Southland engaged PJT Partners LP ("PJT") as investment banker.[28]

PJT's marketing process was robust and comprehensive. It sought proposals for the entirety of Southland's business as well as separate proposals for the Wamsutter Assets and San Juan Assets. PJT contacted over 200 potential purchasers, including strategic acquirers and financial investors. It prepared a marketing teaser, which was distributed to potential bidders and posted electronically to a commonly used, industry-specific database of sale opportunities. It also established a virtual data room populated with necessary due diligence information.

The sale process began in January 2020 and was multi-staged to find a stalking horse purchaser whose bid would set the base for a competitive auction. In stage one, approximately 75 potential parties who executed confidentiality agreements gained access to the virtual data room. PJT set a deadline of March 13, 2020 for these parties to submit first round, non-binding indications of interest that ignored the L63 MVC.[29] It did so to determine the relative value of Southland's assets and have a basis for comparing bids.[30] At the conclusion of this stage, Southland received nine non-binding indications of interest for the Wamsutter Assets (individually or as part of a combined package with the San Juan Assets). All those who submitted indications of interest were then invited to participate in stage two. PJT set a deadline of April 10, 2020 for these second-round participants to complete further due diligence and submit binding bids to serve as stalking horse.[31] PJT instructed the bidders to address in any further bid the Gas Gathering Agreements and the L63 MVC.[32]

During the sale process, the Gas Gathering Agreements and the L63 MVC were focal points. The Gas Gathering Agreements and summaries thereof were included in the virtual data room and discussed in court documents.[33] Moreover, both PJT and Wamsutter discussed them with potential parties. The stage one process letter made it clear that Southland intended to facilitate discussions with Wamsutter so that second-round participants could try and reach a mutually agreeable renegotiation of contract terms in advance of submitting a binding bid.[34] Such

---

[27] On May 28, 2020, the Court approved the sale of the San Juan Assets to MorningStar Operating LLC. Bankr. D.I. 562.

[28] *See* Bankr. D.I. 189.

[29] *See* Ex. 411.

[30] *See, e.g.*, *id.*

[31] *See* Ex. 424.

[32] *Id.*

[33] *See, e.g.*, Bankr. D.I. 10 (*Declaration of Frank A. Pometti in Support of Voluntary Petition, First Day Motions and Application*); Bankr. D.I. 93 (*Limited Objection of Wamsutter LLC to Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition RBL Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief*).

[34] *See* Ex. 411.

discussions did take place with Wamsutter's willing participation. Indeed, Wamsutter offered a possible solution to the challenges posed by the L63 MVC, provided detail to parties, and was available alongside Southland to answer diligence questions.

Ultimately, despite the parties' efforts, Southland received no binding offers for the Wamsutter Assets. According to PJT, the L63 MVC was the cause. Thereafter, Southland decided to defer the sale of its Wamsutter Assets and pursue this litigation.

## III.    RELEVANT PROCEDURAL HISTORY

Southland initiated the instant adversary proceeding by filing its *Complaint* on March 27, 2020.[35] It amended the Complaint by filing the *First Amended Complaint for Avoidance and Declaratory Relief* (the "Amended Complaint") on May 1, 2020.[36]

The Amended Complaint contained fourteen counts, seeking a series of relief aimed at eliminating the burdensome L63 MVC as well as Wamsutter's alleged real property interests in the Wamsutter Assets and the Wamsutter Gathering System. Specifically, the Amended Complaint sought:

1.      Avoidance and recovery (or a declaration of avoidability and recovery), pursuant to sections 362(a)(3), 544(a)(1), 544(a)(3), 547(b), 549 and/or 550(a), of the L63 Memorandum, any conveyances of or interests in real property granted under the Gas Gathering Agreements, an easement agreement related to the Chain Lake Compression Station, any interests of Wamsutter in the Wamsutter Gathering System, and any unrecorded Wamsutter easements and rights of way encumbering Southland's real property [Counts 1, 2, 10, 11, 12, and 14];

2.      A declaration that the L60 Agreement is not a covenant running with the land but rather, an executory contract that may be rejected pursuant to section 365 [Count 3];

3.      A declaration that the L63 Agreement is not a covenant running with the land but rather an executory contract that may be rejected pursuant to section 365 [Count 4];

4.      A declaration that the L63 MVC is not a covenant running with the land and must be severed from the L63 Agreement [Count 5];

5.      A declaration that the L63 MVC is void and unenforceable as a restraint on alienation [Count 6] or as an unenforceable penalty [Count 7];

6.      A declaration that, if Southland may assume the L60 Agreement and reject the L63 Agreement, it may flow – and Wamsutter must service – all gas subject to the L63 Agreement under the terms of the L60 Agreement [Count 8]; and finally,

---

[35] Adv. D.I. 1.

[36] Adv. D.I. 29.

7.     A declaration that Southland may sell, pursuant to section 363(f), the Wamsutter Assets free and clear of any interests held by Wamsutter therein, including any interests created by the L60 Dedication and the L63 Dedication [Count 13].

Wamsutter moved to dismiss substantially all counts of the Amended Complaint.[37]  On July 28, 2020, following briefing and oral argument, the Court dismissed Southland's claims in Count 1, Count 2 in part, Count 7, and Counts 10 and 12 in part.[38]

On August 11, 2020, Wamsutter answered the Amended Complaint, asserted defenses, and alleged a counterclaim for an administrative expense under section 503(b) for postpetition L63 MVC Fees (the "Counterclaim").[39]  On August 24, 2020, Wamsutter also filed *Wamsutter LLC's Motion for Adequate Protection, or Alternatively, for Relief from the Automatic Stay* (the "Adequate Protection Motion"), seeking among other things adequate protection pursuant to sections 361 and 363(e) for the declining value of its interests in the Wamsutter Gathering System arising from Southland's continued use and benefit.[40]  The Court set the Adequate Protection Motion for hearing concurrently with the trial on the Amended Complaint and Counterclaim.

For the sake of efficiency, the parties subsequently stipulated to reduce the scope of trial.[41]  Specifically, the parties agreed to dismiss the Counterclaim and to withdraw the Adequate Protection Motion without prejudice.  They also agreed to dismiss with prejudice Southland's remaining claims in Counts 9 through 12, along with those in Counts 13 and 14 to the extent that they addressed the property interests at issue in Counts 9 through 12.  Finally, they agreed to dismiss without prejudice Southland's claims in Counts 2 and 3, along with those in Counts 13 and 14, to the extent they addressed the L60 Agreement.[42]

As a result of these pretrial proceedings, the scope of Southland's remaining claims is focused squarely on the L63 Agreement and the L63 MVC.  Namely, the Court has been tasked with deciding (1) whether the L63 Agreement is an executory contract subject to future rejection at Southland's election pursuant to section 365 (Count 4); (2) whether the L63 MVC may be severed from the L63 Agreement (Count 5) or declared void and unenforceable as a restraint on alienation (Count 6); (3) if and when the L63 Agreement is rejected, whether Southland may flow, and Wamsutter must service, Southland's gas currently produced in the L63 Area of Interest under the terms of the L60 Agreement (Count 8); and finally, (5) whether Southland may sell the

---

[37] Adv. D.I. 38.

[38] Adv. D.I. 95.  Southland and the Committee sought reconsideration of the Court's decision to dismiss Southland's claims in Counts 1 and 2 of the Amended Complaint with respect to the L63 Agreement.  *See* Adv. D.I. 115, 118.  Following briefing and oral argument, the Court denied the relief requested.

[39] Adv. D.I. 153.

[40] Bankr. D.I. 843.

[41] Adv. D.I. 204; Bankr. D.I. 953.

[42] The parties also filed motions for summary judgment.  *See* Adv. D.I. 58, 85, & 100.  However, at the direction of the Court, the parties did not complete briefing on the motions or present them to the Court given that time did not allow the Court to consider and render a ruling on the motions prior to the start of the trial on the Amended Complaint.

Wamsutter Assets free and clear of any interests of Wamsutter arising from the L63 Agreement (Count 13). The Court held a five-day trial on these issues between September 21, 2020 and September 28, 2020. The parties submitted a *Joint Statement of Uncontested Facts* prior to trial,[43] completed post-trial briefing on October 9, 2020,[44] and presented oral argument on October 23, 2020. The issues presented are thus ripe for adjudication.

## IV. ANALYSIS

### A. *Count 4 – Is the L63 Agreement an Executory Contract Capable of Rejection?*

In Count 4, Southland asks this Court to enter an order declaring that the L63 Agreement is an executory contract, capable of rejection under section 365. Pursuant to section 365(a), subject to the Court's approval, Southland may reject any of its executory contracts. An executory contract is "'a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'"[45] The parties do not dispute that they both have material unperformed obligations under the L63 Agreement. Nonetheless, Wamsutter contests Southland's ability to reject the L63 Agreement because it claims that the agreement (including the L63 MVC) is a real property covenant (specifically, either a covenant running with the land or an equitable servitude). Southland disagrees. It argues that the L63 Agreement did not create any real covenants and that even if it did, the L63 Agreement can still be rejected as an executory contract.

There is a developing split between bankruptcy courts regarding the enforceability of gas gathering agreements in whole or in part as real property covenants. The courts *In re Sabine Oil & Gas Corporation*,[46] *In re Badlands Energy, Inc.*,[47] *In re Alta Mesa Resources, Inc.*,[48] and *In re*

---

[43] Adv. D.I. 190.

[44] Adv. D.I. 219, 223, 224, & 230.

[45] *Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (quoting Vern Countryman, *Executory Contracts in Bankruptcy, Part 1*, 57 MINN. L. REV. 439, 460 (1973)); *see also Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) ("A contract is executory if 'performance remains due to some extent on both sides.'" (quoting *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 522, n.6 (1984)).

[46] *Sabine Oil & Gas Corp. v. HPIP Gonzales Holdings, LLC (In re Sabine Oil & Gas Corp.)*, 550 B.R. 59 (Bankr. S.D.N.Y. 2016) (applying Texas law to find that the certain covenants within a gas gathering agreement were neither covenants running with the land nor equitable servitudes), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018).

[47] *Monarch Midstream, LLC v. Badlands Prod. Co. (In re Badlands Prod. Co.)*, 608 B.R. 854 (Bankr. D. Colo. 2019) (applying Utah law to determine that gathering agreement was a covenant running with the land).

[48] *Alta Mesa Holdings, LP v. Kingfisher Midstream, LLC (In re Alta Mesa Res., Inc.)*, 613 B.R. 90 (Bankr. S.D. Tex. 2019) (applying Oklahoma law to determine that gathering agreements were covenants running with the land).

*Extraction Oil & Gas, Inc.*[49] tackled similar issues to those presented here and interpreted the matter either narrowly (in the cases of *Sabine* and *Extraction*) or broadly (in the cases of *Alta Mesa* and *Badlands*) depending upon each court's application of the particular governing state law. Following a review of Wyoming law[50] and the relevant facts and circumstances applicable to the disputes before the Court, the Court concludes, for many of the same reasons set forth by the courts in *Sabine* and *Extraction*, that the L63 Agreement contains no real covenants. Rather, it is a services contract relating to Southland's personal property. Even if, however, the L63 Agreement contains a real covenant, the Court concludes that it may be rejected under section 365(a).

### 1. Covenant Running with the Land

Under Wyoming law, a covenant includes "promise[s] 'to do, or to refrain from doing, certain things with respect to real property.'"[51] Covenants such as these usually bind only the persons who make them.[52] As emphasized by the Supreme Court of Wyoming in *Lingle Water Users' Association v. Occidental Building and Loan Association*, "[s]ince the early dawn of history up to the present time it has been the general policy of semicivilized and civilized man that no one should be held chargeable with an obligation under a contract except by his consent and that, generally express."[53] Notwithstanding, a covenant can be deemed to "run with the land" such that "the right or obligation passes automatically to successive owners or occupiers of the land or the interest in land with which the right or obligation runs."[54] This type of covenant "inures to the benefit of, or must be fulfilled by, whatever party holds the land at the time when fulfillment is due" and is an exception rather than the rule.[55]

To create a valid covenant running with the land in Wyoming, four elements are required. "The original covenant must be enforceable, the parties must intend that the covenant run with the land, the covenant must touch and concern the land, and there must be privity of estate between

---

[49] *See, e.g.*, *Extraction Oil & Gas, Inc. v. Platte River Midstream, LLC (In re Extraction Oil & Gas, Inc.)*, No. 20-50833, slip op. at 19-44 (Bankr. D. Del. Oct. 14, 2020) (applying Colorado law to find that gas gathering agreements did not create covenants running with the land).

[50] The parties do not dispute that Wyoming law applies to the instant disputes.

[51] *Brumbaugh v. Mikelson L & Co.*, 185 P.3d 695 (Wyo. 2008) (quoting 20 AM. JUR. 2D *Covenants, Conditions and Restrictions* § 1 (2008)).

[52] 20 AM. JUR. 2D *Covenants, Conditions and Restrictions* § 20 (2020).

[53] 297 P. 385, 387 (Wyo. 1931).

[54] *Seven Lakes Dev. Co., LLC v. Maxson*, 144 P.3d 1239, 1245 (Wyo. 2006) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.1(1)(a) (2000 & Cum. Supp. 2006)); *accord Reichert v. Daugherty*, 425 P3d 990, 994 (Wyo. 2018) ("A restrictive covenant that runs with the land is one that 'inures to the benefit of, or must be fulfilled by, whatever party holds the land at the time when fulfillment is due.'" (quoting *Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC*, 191 P.3d 125, 130 n.4 (Wyo. 2008)).

[55] *Lingle*, 297 P. 385, 387 (Wyo. 1931).

the parties."[56]  Because it is determinative to the scope of Court's analysis, the Court will begin with the second element – whether the parties intended for the L63 Agreement run with the land.

### (a)    Intent of the Parties

"Covenants are contractual in natural and, courts should interpret them as they would a contract."[57]   Accordingly, to determine if Southland and Wamsutter intended for the L63 Agreement to run with the land, the Court need not look any further than the clear and unambiguous language of the L63 Agreement.[58]  More specifically, section 1.1(a), which sets forth the L63 Dedication, provides in pertinent part that:

> ***This Dedication shall be a covenant running with the land under applicable law and binding on the respective successors and assigns of the interests of the Shipper and its Affiliates in and to the Dedicated Properties and Dedicated Gas.***  If applicable law requires any amendment or modification to this Agreement ***for this Dedication to be treated as an enforceable covenant running with the land***, the parties will promptly enter into any such addendum or modification.[59]

No other provision in the L63 Agreement contains this or similar language.  Indeed, section M.7 of the L63 Agreement addresses future transfers of Southland's assets and makes it clear that it is only the L63 Dedication that runs with the land and that all other rights of Wamsutter will be preserved as against Southland:

> Any transfer of Shipper's right, title, or interest in the Dedicated Properties or Dedicated Gas will not impair ***their dedication to Williams*** or Williams' rights under this Agreement as against Shipper.  ***Shipper is responsible for notifying any Party to whom the right, title or interest is transferred that the Dedicated Properties and Dedicated Gas are dedicated to Williams pursuant to this Agreement***, and Shipper is responsible for ensuring ***that any Produced Dedicated Gas is delivered to Williams*** in accordance with this Agreement.[60]

---

[56] *Mt. W. Mines, Inc. v. Cleveland-Cliffs Iron Co.*, 376 F. Supp. 2d 1298, 1304 (D. Wyo. 2005) (citing *Jackson Hole Racquet Club Resort v. Teton Pines Ltd. P'ship*, 839 P.2d 951, 956 (Wyo.1992)).

[57] *Reichert*, 425 P.3d at 995 (quoting *Gumpel v. Copperleaf Homeowners Ass'n, Inc.*, 393 P.3d 1279, 1290 (Wyo. 2017)).

[58] *Id.* ("The words used in the contract are afforded the plain meaning that a reasonable person would give them.  When the provisions in the contract are clear and unambiguous, the court looks only to the four corners of the document in arriving at the intent of the parties." (internal quotations and citations omitted)).

[59] Ex. 258 at § 1.1(a) (emphasis added).

[60] *Id.*, Ex. A § M.7 (emphasis added).

To support its argument that the entire L63 Agreement runs with the land, Wamsutter points to section M.8[61] but that provision addresses the assignment of the respective parties' interests in the L63 Agreement to third parties. If anything, it contemplates the scenario in which third party assignees of Southland voluntarily agree to assume the L63 Agreement and its terms. Binding parties to assigned contractual covenants based on privity of contract is a situation distinct from binding them based on land ownership. Accordingly, the parties' intent under the scenario set forth in section M.8 is not helpful to the Court. Wamsutter also argues that the parties intended the entire L63 Agreement to run with the land because the L63 Dedication was "to the performance of th[e] Agreement[.]"[62] However, this interpretation conflates the purposes of the L63 Dedication with the intent element of the covenant running with the land analysis.

Dedications are typical and customary in the oil and gas industry. In general, a dedication in a gas gathering agreement is a producer's commitment of gas production from specific acreage owned or leased to a midstream provider and a grant to that midstream provider of the exclusive right to service all such production for, among other things, a specified term and fees. By entering into the exclusivity arrangement, a producer (and its produced gas) gains access to the midstream provider's valuable gathering system and committed midstream services whenever needed, without which the producer would have no way to transform its produced gas into a merchantable form. By foregoing the opportunity to build and maintain their own gathering system, producers can focus their capital and efforts on exploration and production. In exchange, producers are bound to use a specific midstream provider and its gathering system for a committed term. For a midstream provider, the exclusivity arrangement coupled with the agreed upon term and fees provide assurances that the provider will have the opportunity to recoup its investment after spending significant capital developing a gathering system and committing their system and services to a producer. In return, the midstream provider must commit its system to the producer's dedicated production regardless of whether the producer is producing from its wells or at the volume forecasted.

The L63 Dedication is no different and, through the language relied upon by Wamsutter, it seeks to accomplish the aforementioned purposes. Nowhere in the agreement do the parties unambiguously express an intention for all promises therein to run with the land. Although, as will be discussed herein, certain provisions of the L63 Agreement (including the L63 MVC) are intertwined with the L63 Dedication and were critical inducements of Wamsutter's services, the parties clearly knew how to make their intentions known with respect to which covenants they wanted to run with the land, and they did so unambiguously only for the L63 Dedication. The striking omission of similar language from the remaining terms of L63 Agreement suggests that all other obligations are personal.[63] Moreover, none of the documents in evidence or witness

---

[61] *Id.*, Ex. A § M.8 ("Assignment. If Shipper wants to assign part or all of its interest in this Agreement . . ., it can only do so after giving prior notice to Williams of the intended assignment and delivering to Williams such affiliate's or successor's assumption of this Agreement.").

[62] *Id.* at § 1.1(a).

[63] *See Mathisen v. Thunder Basin Coal Co., LLC*, 169 P.3d 61, 66 (Wyo. 2007).

testimony indicate that Southland intended the entire L63 Agreement to run with the land. And the parties never discussed it, let alone agreed.[64]

In Wyoming, "[r]estrictions upon the use of land, being in derogation of the common law, are not favored, are to be strictly constructed, will not extend by implication, and in case of doubt the restriction will be constructed in favor of the free use of the land . . . ."[65] In light of such directive, the Court cannot simply bootstrap the remaining terms of the L63 Agreement to the L63 Dedication and by implication, conclude that the parties intended them to run with the land. Such an interpretation would be too broad.

### (b)     Touch and Concern the Land

Having decided that the parties intended for only the L63 Dedication to run with the land, the Court next determines whether the L63 Dedication touches and concerns the land. Wyoming law has not clarified the standard to determine whether a covenant touches and concerns the land. However, in *North Finn v. Cook*,[66] the United States District Court for the District of Wyoming quoted the following from the Utah Supreme Court's decision in *Flying Diamond Oil Corporation v. Newton Sheep Company*[67] when it determined that a working interest touched and concerned land:

> What is essential is that the burdens and benefits created are not the personal duties or rights of the parties to a covenant that exist independently from the ownership of an interest in the land. . . . **"[T]he distinction between covenants which run with land and covenants which are personal, must depend upon the effect of the covenant on the legal rights which otherwise would flow from ownership of land and which are connected with the**

---

[64] *See, e.g.*, Adv. D.I. 958 (Sept. 21, 2020 Tr. at 141-42, 146 (testimony of Mr. Casey that Southland and Wamsutter never discussed the L63 MVC running with the land)); Carey Declaration ¶ 30 (same); Adv. D.I. 977 (Sept. 28, 2020 Tr. at 51-53 (testimony of Mr. Bracher that he does not recall either Southland or Wamsutter having ever discussed the L63 MVC running with the land or more generally, the scope or coverage of the covenant running with the land, save the language included in the L63 Agreement)).

[65] *Kincheloe v. Milatzo*, 678 P.2d 855, 859 (Wyo. 1984) (quoting *Kindler v. Anderson* , 433 P.3d 268 (1967), and refusing to imply a covenant to a specific subdivision area, explaining the rule that "implied covenants are not favored in the law and will not be found to exist unless the language of the instrument leads unerringly to the conclusion that the parties intended the covenants to attach."); *Pennaco Energy Inc. v. KD Co., LLC*, 363 P.3d 18, 37 (Wyo. 2015) ("Because servitudes are interests in land with potentially long-term effects on land use and value, they should be expressly created by carefully drawn written instruments. A contract or conveyance intended to create a servitude should express that intent in words that unambiguously spell out the nature and terms of the intended servitude.").

[66] 825 F. Supp. 278, 282 n.8 (D. Wyo. 1993).

[67] 776 P.2d 618 (Utah 1989).

**land.  The problem then is:  Does the covenant in purpose and effect *substantially* alter these rights?[68]**

Here, the L63 Dedication does not alter Southland's legal rights in its real property.  Rather, it accomplishes the aforementioned customary purpose of dedications in the oil and gas industry and gives Wamsutter an exclusive right to "Gather, Process, Dehydrate and Treat [Southland's] Produced Dedicated Gas"[69], *i.e.* Southland's gas produced in the L63 Area of Interest.  Despite the language of the L63 Dedication that "dedicates" or commits Southland's "Dedicated Properties" and "Dedicated Gas" to Wamsutter, the L63 Dedication does not convey any right, title, or interest in the Dedicated Gas or Dedicated Properties to Wamsutter, and it places no restrictions or any other burden on such property.

It is undisputed that Southland is free to do what it likes with its unproduced gas reserves, including decreasing or ceasing further exploration, drilling, and production.[70]  Moreover, Wamsutter has no right to enter the L63 Area of Interest and access or control Southland's unproduced reserves, including through its own development.[71]  It is only once the gas in the L63 Area of Interest is produced that the L63 Dedication takes affect by requiring the production to be serviced by Wamsutter and the Wamsutter Gathering System in exchange for the agreed upon fees.  At that point, Wamsutter takes title to and control of the produced gas until it is delivered back to Southland at delivery points.[72]  Furthermore, as explained more thoroughly herein, Wamsutter's right and obligation to gather the produced gas is even further limited to production accessible at certain defined L63 Receipt Points.[73]  Wamsutter has argued that the L63 Dedication granted it

---

[68] *N. Finn*, 825 F. Supp. at 282 n.8 (emphasis in original) (quoting *Flying Diamond*, 776 P.2d at 623); *see also Jackson Hole*, 839 P.2d at 957 (explaining that the trial court examined whether the covenant at issue burdened or "restrict[ed] in any way the use or development of the property" rather than simply restricting contractual freedom of present and future owners).

[69] Ex. 258 at § 1.1(a).  The term "Produced Dedicated Gas" is defined by the parties as "Dedicated Gas after it has been produced."  *Id.*, Ex. A.  "Dedicated Gas" means "all Gas owned or Controlled by Shipper or its Affiliates (and their successors and assigns) in and under the Dedicated Properties before it has been produced, except as provided in Section 1.1(b)."  *Id.*  "Dedicated Properties" means "all interests owned or Controlled by Shipper and its Affiliates (and their successors and assigns) at any time during the term of this Agreement in oil, Gas or mineral leases covering lands (and the formations underlying such lands) within the Dedication Area, except as provided in Section 1.1(b)."  *Id.*

[70] *See id.*, Ex. A at § J.1 ("Shipper is in control and possession of Produced Dedicated Gas until delivered to Williams at the Receipt Point and following its delivery by Williams at the Delivery Point[.]"); *Id.* § J.2 ("Williams is in control and possession of Produced Dedicated Gas from the time delivered to Williams at the Receipt Point until it is delivered by Williams at the Delivery Point[.]"); *Id.* § J.4 ("Shipper warrants that at the time of delivery of Gas for its account at the Receipt Point, it has title to the Gas free and clear of all liens, encumbrances, and claims whatsoever, or if not title[,] has an unencumbered right to control the production and disposition of the Gas . . . .").

[71] *Id.*

[72] *Id.*

[73] *See* Section IV.D.

rights in Southland's mineral estate[74] because it was given the exclusive right to participate in the development of the gas (*i.e.* search and removal) and because Southland agreed through the L63 Dedication to set apart its unproduced reserves for the definite use of gathering and processing by Wamsutter. However, the foregoing facts contradict these arguments.[75]

The only property directly benefited and burdened by the L63 Dedication is Southland's produced gas in the L63 Area of Interest, and in Wyoming such property is personal property rather than realty.[76] At bottom, the L63 Agreement is a contract for Wamsutter's services in the L63 Area of Interest so that Southland can monetize its production. To facilitate the provision of the services, the parties agreed to the L63 Dedication, which established their exclusive relationship and its geographic boundaries. But the L63 Dedication does not directly affect Southland's real property rights.

Wamsutter has argued that the L63 Dedication benefits and burdens Southland's mineral estate because it paves the exclusive road for Southland's unproduced reserves to reach market. However, to the extent that there are benefits provided to or burdens imposed upon Southland's unproduced reserves as a result of the L63 Dedication, including those related to value or use, they are indirect, arising from the provision of Wamsutter's services with respect to Southland's personal property – the produced gas. The consideration of these indirect effects in the touch and concern analysis could lead to an expansion of the type of covenants that run with the land and improperly serve to restrict alienability of land beyond ways currently contemplated by Wyoming law.

---

[74] A mineral estate, also known as a mineral fee or mineral interest "is 'an estate in fee simple in and to the minerals.'" *Smith v. B&G Royalties*, 469 P.3d 1206, 1212 (Wyo. 2020) (quoting *Picard v. Richards*, 366 P.3d 119, 123 (Wyo. 1961)). "The ownership of an unrestricted mineral interest includes all the incidents of ownership [and] . . . . [m]ineral fee owners have the capacity to create and convey any one or all of a myriad of separately identifiable interests in oil and gas under their property[.]" *Id.* (quotations and citations omitted). The mineral estate "includes five essential interests: the right to develop, the right to lease, the right to receive bonus payments, the right to receive delay rentals, and the right to receive royalty payments." *Id.* at 1212 n.3.

[75] Wamsutter has also argued that it has a right to receive production from a specified parcel of land and that this right is an interest in real property. In support, it cites to *Denver Joint Stock L & Bank of Denver v. Dixon*, 122 P.2d 842 (Wyo. 1942). That case was an action to quiet title to land where the existence of an overriding royalty for minerals still in the ground was in dispute. The mineral interest there – a royalty right - arose from a reservation in a conveyance of the underlying real estate. Here, the L63 Dedication does not involve any real property conveyances or reservations. It gave rise to rights with respect to Southland's produced gas in the L63 Area of Interest and nothing more. *Cf. Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 976 (Wyo. 1994) (finding a net profit interest to be a personal property right, and holding "[n]othing in the agreement purports or can be read to give Coronado title to the minerals while they are *in situ* or the right to bonus and delay rentals, the traditional indicia of a mineral interest.").

[76] *See, e.g.*, *Denver Joint*, 122 P.2d at 845 ("It is true, of course, that when oil and gas have been brought to the surface, they become personal property."); *State v. Snyder*, 212 P. 758, 766 (Wyo. 1923) ("The final disposition of the oil or gas, or sale, if we please to call it so, does not take place - is not in any event consummated - until after the oil is taken from the earth, has become severed from the realty, and has become personal property.").

The court in *Lingle* explained that "the nature of the covenant and its relation to the estate must, in addition [to the intention of the parties], be such that the law will permit the intention to be effectual." In support, it cited to *Kettle River Road Company v. Eastern Railway Company*, which held that a railroad's exclusive right to transport products of a stone quarry did not constitute a covenant running with the land or an equitable servitude.[77] In reaching its conclusion, the court determined that the exclusivity covenant "was not of such a nature that it can be said to inhere in the land . . ." and that it was "not enough that a covenant affects the use of land, or the enjoyment of an easement therein, or the value or profitableness of the use thereof, in a collateral way."[78] Those circumstances expressly rejected in *Kettle* are what Wamsutter urges this Court to consider.

Notwithstanding, Wamsutter argues that the Wyoming Supreme Court has more recently endorsed in *Jacobs Ranch Coal Company v. Thunder Basin Coal Company, LLC*[79] the view of the court in *Flying Diamond* that the touch and concern element is satisfied if the covenant at issue "be of such a character that its performance or nonperformance will so affect the use, value, or enjoyment of the land itself that it must be regarded as an integral part of the property."[80] In *Flying Diamond*, the court explained that the touch and concern element could be satisfied if the covenant "enhances the land's value [on the benefit side], and for the burden side, . . . [if] it diminishes the land's value."[81] However, the court in *Jacobs Ranch* did not adopt these particular recitations of the law from *Flying Diamond*. Rather, the court described the Utah Supreme Court's decision in *Flying Diamond* as illustrative only with respect to the element of intent.[82] It stopped short of adopting any of the court's touch and concern analysis.[83] Moreover, neither the *Flying Diamond* nor the *Jacobs Ranch* case present a situation analogous to the one before the Court.[84]

---

[77] 43 N.W. 469, 474 (Minn. 1889).

[78] *Id.* The court in *Lingle* also cited *California Packing Corporation v. Grove*, 196 P. 891 (Cal. Dist. Ct. App. 1921), which held that a contract to sell peaches grown on an orchard for certain years to the plaintiff was not a covenant running with the land. In reaching such conclusion it observed that, among other things, "[t]he contract does not involve the title or right of possession of the land" and that "[o]nly those covenants that are made for the direct benefit of the property and are contained in a grant of the property run with the land." *Id.*

[79] 191 P.3d 125 (Wyo. 2008).

[80] 776 P.2d at 624 (quoting *Lundeberg v. Dastrup*, 497 P.2d 648, 650 (Utah 1972)).

[81] *Id.* (quoting *Leighton v. Leonard*, 589 P.2d 279, 281 (Wash. Ct. App. 1978)).

[82] 191 P.3d 125, 130 (Wyo. 2008).

[83] *See id.* at 130 n.5.

[84] In *Flying Diamond*, the covenant at issue was a promise made by a mineral estate owner to a surface owner to pay a certain amount based on the value of oil and gas produced from the mineral estate. *Id.* at 620. The promise was made when the surface owner conveyed broad surface rights to the mineral estate owner to enable it to carry on oil and gas exploration. *Id.* The question before the court was whether the promise to pay was a covenant running with the surface of the land. *Id.* In answering the question in the affirmative, the court found that the payment was "a rough form of compensation" for the burdens imposed upon the surface operations of surface owner, and that there was a "mutual dependence of the two covenants and their relationship to the ownership of the surface of the land." *Id.* at 625-26 ("Because of the disruptive potential of Champlin's rights and easements on surface operations, Champlin had a legitimate and well-founded purpose in trying to reduce friction with the surface owner by giving the owner a monetary interest

---

Accordingly, the Court will refrain from considering the indirect effects of the L63 Dedication on Southland's real property and conclude that the L63 Dedication does not touch and concern the land. Therefore, it cannot run with the land under Wyoming law.

### (c)     Privity of Estate

Despite concluding that the L63 Dedication does not run with the land, the Court will briefly address the final element of the Wyoming covenant running with the land analysis – privity of estate.[85] "[P]rivity of estate can only be created in the first instance in connection with a grant of the land sought to be charged, or an estate therein, or the equivalent thereof."[86]

To establish privity, Wamsutter relies on the L63 Dedication, a floating easement granted by Southland to Wamsutter in the L63 Agreement,[87] and easement agreements entered into between the parties.[88] However, the L63 Dedication is not a real property conveyance; it is an exclusivity agreement. Moreover, the estate burdened by the various easements and other rights of access – Southland's surface lands – is not the same estate allegedly burdened by the L63 Dedication – Southland's mineral interests. Accordingly, privity of estate is not established under the teachings of *Lingle*:

> A covenant real is, and can only be incident to land. It cannot pass independent of it. It adheres to the land, is maintained by it, is in fact a legal parasite, created out of and deriving life from the land to which it adheres. It follows, that the person in whose favor a covenant is made must have an interest in the land charged with it; for he can only get the covenant through, and as an incident to, the land to which it is attached.[89]

---

in the success of Champlin's oil and gas operations in the area."). Similarly, a surface royalty provision contained within a deed conveying a surface estate was at issue in *Jacobs Ranch*. 191 P.3d at 127. In those cases, there was a direct conveyance of property giving rise to the subject covenant (a promise to pay) that was enforceable by the grantor and with which the subject covenant could be associated and run. *Flying Diamond*, 776 P.2d at 625 ("[A] promise to pay money may touch and concern the land if its purpose is to benefit the covenantor's interest in the land."). Here, the L63 Dedication did not arise in connection with a conveyance by Wamsutter of any real property to Southland and the covenant at issue is not for the payment of money.

[85] Issues of enforceability have also been raised. Citibank, on behalf of the RBL Lenders, has asserted that Southland lacked the authority to grant a covenant running with the land because of the terms of the Prepetition RBL Credit Agreement and related lending documents. It also has argued and put forth evidence that Wamsutter knew at the time of contracting with Southland of the lending terms and the RBL Lenders' resulting rights and interests. The Court need not address these issues as well as their effect on the remainder of the covenant running with the land elements given the conclusions already reached herein.

[86] *Lingle*, 297 P. at 391.

[87] *See* Ex. 258, Ex. A § B.4.

[88] *See, e.g.*, Ex. 193, 194, & 195.

[89] 297 P. at 392.

At oral argument Wamsutter argued that Southland owns both surface and mineral estates, however, the Court does not believe that this fact alters its conclusions as it appears that the two estates have been severed.[90]

### 2. Equitable Servitude

As an alternative to a covenant running with the land, Wamsutter argues that the L63 Agreement may be enforced as an equitable servitude. Similar to a covenant running with the land, a covenant may be enforced against future landowners as an equitable servitude if such parties took the land with notice of the covenant and the seller intended to bind them to such covenant.[91] Wamsutter asserts that these elements are satisfied with respect to the L63 Agreement because any purchaser of the Wamsutter Assets will take the property with notice of the L63 Agreement in light of, among other things, the recorded L63 Memorandum.

As already explained, the only provision of the L63 Agreement to which Southland intended to bind future landowners is the L63 Dedication. However, regardless of a purchaser's notice of the L63 Dedication, it does not touch and concern Southland's real property and thus could never be enforced as an equitable servitude. Wamsutter asserts that the equitable servitude analysis does not require a covenant to touch and concern the land, but the Court disagrees. Wamsutter has cited no Wyoming cases in which a court enforced a covenant in equity that did not satisfy the touch and concern element, and the Court has been unable to find any such cases.

Moreover, the inclusion of the touch and concern element is recognized by the AMERICAN JURISPRUDENCE, SECOND EDITION, a source upon which Wyoming courts often rely when analyzing the topic of real covenants:

> Covenants that relate to the land or its mode of use or enjoyment are frequently enforced in equity against subsequent grantees with notice. The fact that the grantees are not specifically named in the instrument or that no direct privity of estate exists will not affect the application of this rule. Performance of a covenant may be decreed in favor of persons claiming under the parties to the agreement or by virtue of their relationship thereto, notwithstanding the technical character and form of the covenant, regardless of whether the covenant runs with the land, as the well-settled rule is that a covenant will be enforced in accordance with the intention of the parties.
>
> Thus, a court of equity will enforce any acceptable agreement affecting land against a purchaser with notice of the agreement, whether or not the agreement runs with land, unless the agreement

---

[90] *See, e.g.*, *Clay v. Mt. Valley Mineral Ltd. P'ship*, 351 P.3d 961, 971 (Wyo. 2015) (citing *State ex rel. Cross v. Bd. of Land Comm'rs*, 58 P.2d 423, 430-31 (1936)) ("A fee simple estate may be owned in the entire property before the minerals are severed or in the surface and/or the mineral estates after severance.").

[91] *Cash v. Granite Springs Retreat Ass'n, Inc.*, 248 P.3d 614, 619 (Wyo. 2011).

involved only remotely and indirectly relates to use of the benefited land by the purchasers.  Under some authority, a covenant passing with a conveyance of the land and enforceable against subsequent grantees with notice creates what is familiarly known as equitable easements of servitude.[92]

Indeed, in an analogous situation, the United States District Court for the District of North Dakota in *Slawson Exploration Company, Inc. v. Nine Point Energy, LLC* rejected an argument that equitable servitudes need not touch and concern the land and explained that such a requirement is necessary to avoid the serious restraints on alienation that could occur if landowners were able to impose upon future owners obligations totally unrelated to the land of either party.[93]  It noted that "[i]f there were no touch and concern requirement, a grantor of land could, for example, aid the grantor's favorite charity by obtaining for the grantee a covenant expressly binding the grantee and the grantee's successors to contribute sums of money annually forever to that charity."[94]

### 3.    Rejection of the L63 Agreement

Having found that the L63 Agreement does not contain any real covenants, Southland is free to seek its rejection as an executory contract pursuant to section 365(a).  Accordingly, the Court will enter judgment in favor of Southland on Count 4.  However, assuming *in arguendo* that the L63 Dedication is a real covenant, Southland may still reject the L63 Agreement.  Real

---

[92] 20 AM. JUR. 2D *Covenants, Conditions, and Restrictions* § 45 (2020); *see also Kettle* 43 N.W. 469 at 475 ("Such privileges or restrictions, which are sometimes called equitable easements, servitudes, or amenities, are enforced by injunction irrespective of the question of privity of estate, or the nature of the tenure, but they must be such as relate to or concern the land or its use or enjoyment. . . . [E]quity follows the law in that it will not enforce a covenant as against the heir or assignee unless the obligation it imposes is one which attaches to or concerns the land or its use of mode of enjoyment."); *accord In re Snow*, 201 B.R. 968, 973 (Bankr. C.D. Cal. 1996) ("Like a covenant running with the land, an equitable servitude must 'touch and concern' the land that it burdens.  This requirement dates back to *Spencer's Case*[.]"); *Pollock v. Ramirez*, 870 P.2d 149, 153 (N.M. Ct. App. 1994) ("In order to establish the existence of equitable servitudes, a party must show that: (1) the equitable servitudes touch and concern the land; (2) the original covenanting parties intended the equitable servitudes to run; and (3) the successor to the burden had notice of the equitable servitudes."); *Runyon v. Paley*, 416 S.E.2d 177, 189 (S.C. 1992) (same) (citing 5 POWELL ON REAL PROPERTY ¶ 673[1] at 60–44.0); *Gambrell v. Nivens*, 275 S.W.3d 429, 437 (Tenn. Ct. App. 2008) (same); *Meritage Homeowners' Ass'n v. Bank of New York Mellon*, No. 16-00300, 2018 WL 1787183, at *6 (D. Or. Apr. 13, 2018) (same); 7 THOMPSON ON REAL PROPERTY § 62.09 (Thomas Eds.) (discussing the applicability of touch and concern to equitable servitudes); Alfred L. Brophy, *Contemplating When Equitable Servitudes Run with the Land*, 46 ST. LOUIS U. L.J. 691 (2002) ("The hornbook law on equitable servitudes is that they run if there is (1) intent for them to run, (2) notice, and (3) they 'touch and concern' the land." (internal citations omitted)).

[93] No. 17-106, 2019 WL 1518164, at *7 (D.N.D. Apr. 8, 2019) (quoting John E. Cribbet & Corwin W. Johnson, *Principles of the Law of Property* 383 (3d ed. 1989)).

[94] *Id.*

covenants are contractual obligations, albeit exceptional forms that bind landowners regardless of their consent.[95]  As the court in *Extraction* recently explained:

> Consistent with Section 365, when considering whether real covenants or instruments creating real covenants can be rejected, courts have generally considered whether those covenants meet the definition of an executory contract.  Most courts, that have held covenants running with the land cannot be rejected have found that the covenant was not an executory contract because it lacked material obligations on both sides or did not otherwise constitute a contract.[96]

As noted, there are material unperformed obligations remaining by both Southland and Wamsutter under the L63 Agreement, including with respect to the L63 Dedication.  Most notably, Wamsutter must gather and process Southland's produced gas from the L63 Receipt Points in the L63 Area of Interest, and Southland must satisfy the L63 MVC (and pay associated L63 G&P Fees) or pay the L63 MVC Fee.  Given the executory nature of the L63 Agreement, there is nothing in the Bankruptcy Code that prevents its rejection if real covenants do in fact exist.[97]

If Southland rejects the L63 Agreement, it repudiates any further performance of its remaining duties thereunder, including its exclusivity promise to Wamsutter with respect to the gas it produces in the future.  Wamsutter will then have a prepetition claim against the estate for damages resulting from Southland's nonperformance.  This claim will include unpaid L63 MVC Fees and L63 G&P Fees.[98]  Importantly, Wamsutter does not lose any rights that it already received under the rejected agreement.[99]

---

[95] *See supra* notes 51 - 57 and accompanying text; *see also Star Valley Ranch Ass'n v. Daley*, 334 P.3d 1207, 1210 (Wyo. 2014) ("Restrictive covenants are contractual in nature, and are interpreted in accordance with the principles of contract law.").

[96] *In re Extraction Oil & Gas*, No. 20-11548, 2020 WL 6389252, at *7 & n.34-36 (Bankr. D. Del. Nov. 2, 2020) (collecting cases).

[97] *See* 11 U.S.C. § 365(a) ("Except as provided in sections 765 and 766 of this title and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."); *N.L.R.B.*, 465 U.S. at 521-22 (noting that section 365(a) permits the rejection of all executory contracts except those expressly exempted); *see also Arden & Howe Assocs., Ltd.*, 152 B.R. 971, 974 (Bankr. E.D. Cal. 1993) (permitting rejection of lease with a restrictive covenant that ran with the land, explaining that a "lease of real property is simultaneously a conveyance and a contract" and that "[w]hile the Bankruptcy Code does not permit a taking of the lessee's estate in real property, it does authorize the landlord to reject executory lease covenants."); *Home Express, Inc. v. Arden & Howe Assocs., Ltd. (In re Arden & Howe Assocs., Ltd)*, No. 91-2299, 1993 WL 129784, at *4 (E.D. Cal. Mar. 1, 1993) ("The restrictive use covenant requires future performance, and courts have consistently held rejection relieves a trustee from covenants requiring future performance.").

[98] *Mission Prod.*, 139 S. Ct. at 1658.

[99] *Id.* at 1662 ("A rejection does not terminate the contract.  When it occurs, the debtor and counterparty do not go back to their pre-contract positions.  Instead, the counterparty retains the rights it has received under the agreement.  As after a breach, so too after a rejection, those rights survive."); *see also In re Chesapeake*

With respect to the continued enforcement of any real covenants in the rejected L63 Agreement against subsequent purchasers of the Wamsutter Assets, it appears to the Court that the purpose of the L63 Dedication will be satisfied by Wamsutter's bankruptcy claims for fees. The L63 Dedication ensured that Wamsutter received financial compensation in the form of the L63 MVC Fees and L63 G&P Fees for the provision of its services and infrastructure.[100] A claim against the estate for these amounts due to Southland's rejection and resulting breach of the L63 Agreement (including the L63 Dedication) would fully compensate Wamsutter and be consistent with the terms of the L63 Agreement and state law.[101] Continued enforcement of the L63 Dedication against a subsequent purchaser would thus be inequitable and against public policy.[102]

Nonetheless, to the extent that the foregoing analysis is incorrect and that following rejection Wamsutter has interests as a result of the L63 Dedication enforceable against a subsequent purchaser of the Wamsutter Assets, the interests can be extinguished pursuant to section 363(f) as set forth herein with respect to Count 13.

**B.      *Count 5 – Is the L63 MVC Severable?***

In Count 5, Southland seeks a declaration that the L63 MVC is not a covenant running with the land and that it may be severed from the L63 Agreement. With respect to the former point, the Court has just explained that the L63 MVC is not a real covenant given the parties' lack of intent. With respect to the latter point, Southland argues that the L63 MVC is subject to separate and independent performance and thus can be severed under traditional legal principles.[103]

---

*Energy Corp.*, No. 20-33233, 2020 WL 6325535, at *5 (Bankr. S.D. Tex. Oct. 28, 2020) ("ETC repeatedly asserts that the ETC Purchase Agreement cannot be an executory contract if it contains a covenant that runs with the land. ETC does not cite nor is the Court able to locate any authority for such a proposition. Likewise, § 365 of the Bankruptcy Code contains no such exclusion and no known rule or law prohibits the mutual existence of both concepts within a single document. It does not stretch the imagination to envision a contract that both contains a covenant that runs with the land and is executory. In such a circumstance, the appropriate analysis is what benefit was previously bestowed by the debtor on the non-rejecting party that remains postrejection and what future performance by the debtor is excused by the rejection.").

[100] *See* Section IV.B (discussing purpose of the L63 Dedication in relation to the L63 MVC and L63 G&P Fees).

[101] *See infra* notes 138 - 141 and accompanying text.

[102] *Accord Extraction*, No. 20-11548, 2020 WL 6389252, at **9-10; *see also See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 8.3, cmt. a (2000) (explaining that a servitude may become unenforceable if inequitable or against public policy); *id.* at § 7.10 (explaining modification and termination of a servitude because of changed conditions).

[103] Southland has also argued that the L63 Agreement mandates severance of the L63 MVC pursuant to section 1.1(a), which provides that "[i]f applicable law requires any amendment or modification to this Agreement for this Dedication to be treated as an enforceable covenant running with the land, the parties will promptly enter into any such addendum or modification." Ex. 258 § 1.1(a). As developed in the parties' briefing, this theory requires the Court to find as a threshold matter that the L63 Dedication is a covenant running with the land and that the L63 MVC is not. As explained, there are no real covenants in the L63 Agreement and thus this alternative theory is moot.

Whether a contract "is an indivisible agreement or is several agreements in one, which should properly be severable, depends on the application of state law."[104] Under Wyoming law, the severability of the L63 MVC depends on the intent of the parties.[105] The evidence indicates that the L63 MVC, the L63 G&P Fees, and the L63 Dedication are essential and inextricable components of a comprehensive compensation package designed to benefit Wamsutter for the investment and services it was and continues to be obligated to provide under the L63 Agreement. Accordingly, the Court will not sever the L63 MVC from the L63 Agreement.[106]

First, the terms of the L63 Agreement indicate that they are dependent. For example, section 1.2 of the L63 Agreement provides that, in the event Wamsutter is not required to construct all of the facilities originally contemplated under the agreement and thus "will not incur all costs included in its original project economics used to determine the commercial terms of [the] Agreement, the Parties agree that the resulting modifications to the commercial terms of [the] Agreement will include . . . a commercially reasonable adjustment to **_the MVC and/or the Fees_** so that Williams is reasonably compensated . . . ."[107] Furthermore, section M.3 of the L63 Agreement contemplates that certain terms of the L63 Agreement aggregate to form a package of economic benefits for Wamsutter, and that such terms cannot be unilaterally severed without possible contract termination:

> If any Court or government authority finds any part of this Agreement unenforceable or orders the Agreement to be modified, only the part of this Agreement subject to the order will be affected. . . . If the part that is unenforceable or modified substantially changes the economic benefits of this Agreement, the Parties will attempt to negotiate reasonable replacement provisions to restore the economic benefits consistent with the original intent of the Parties. If the Parties cannot agree on replacement terms, then either Party may terminate this Agreement by giving the other Party notice of termination.[108]

Finally, the L63 MVC by its very nature is intertwined with the L63 G&P Fee and the associated volumes produced (or not produced). Afterall, if Southland produces the agreed upon minimum

---

[104] _In re Buffets Holdings, Inc._, 387 B.R. 115, 124 (Bankr. D. Del. 2008).

[105] _See, e.g._, _Baker v. Jones_, 240 P.2d 1165, 1171 (Wyo. 1952) ("Primarily the intention of the parties controls in determining the divisibility of a contract." (quotation omitted)).

[106] _See, e.g._, _United Air Lines, Inc. v. HSBC Bank USA (In re United Air Lines, Inc.)_, 453 F.3d 463, 470 (7th Cir. 2006) (finding contract an inherently integrated bargain and noting that there would have been no bargain if a promise was struck out); _Buffets_, 387 B.R. at 124 (examining parties' intent, finding that individual leases incorporated into master leases were economically interdependent, and concluding that the rejection of one lease and the discontinuation of the total rent payment would destroy the essence of the bargaining).

[107] Ex. 258 § 1.2(d) (emphasis added).

[108] _Id._, Ex. A § M.3.

volume of gas each quarter and pays the associated L63 G&P Fee, an L63 MVC Fee will not accrue.[109]

Second, representatives from Southland and Wamsutter testified as to the intertwined nature of the fees[110] and the discussions between the parties during the formulation of the L63 Agreement regarding their dependence.[111] As Wamsutter explained, a volumetric gathering and processing fee could alone fully compensate it. But when it is required to invest a certain amount of capital to construct a gathering system, such as the Hansen Lake/High Point Infrastructure, Wamsutter may require more than a volumetric fee to ensure the recovery of its expenditures. Indeed, even Mr. Casey, a representative responsible for negotiating and managing the L63 Agreement on behalf of Southland, admits that minimum volume commitments like the L63 MVC are intended to minimize the risk that the volumetric gathering and processing fees will not fully compensate a midstream provider due to fluctuations in production.[112]

Without the L63 MVC, Wamsutter could have increased the L63 G&P Fees to ensure repayment of the capital it used to construct the Hansen Lake/High Point Infrastructure. Alternatively, the parties could have agreed on another compensation structure, such as the payment of volumetric gathering and processing fees combined with an up-front, lump sum aid-in-construction payment like the Chain Lake Amendment. This type of fee structure was necessary to Wamsutter and could have taken multiple forms. Southland understood the purpose of the L63 MVC and its importance to Wamsutter.[113] Moreover, Southland understood the risks associated with the L63 MVC at the time of contracting but nonetheless agreed to it.

Finally, although the L63 MVC are intertwined with the L63 G&P Fee, they are also tied to the L63 Dedication. Whereas the fees are the method by which Southland will compensate Wamsutter for its investment and services, the dedication and the exclusivity relationship formed thereby serves as a form of assurance that Wamsutter will realize the fees. The L63 Dedication, the L63 MVC, and the L63 G&P Fees cannot be stripped away from each other without fundamentally altering the bargain the parties struck. As aptly analogized by Wamsutter, they are a three-legged stool without which Wamsutter would not have agreed to provide, and Southland would not have received, the Hansen Lake/High Point Infrastructure and related services. Accordingly, the Court will not parse them away from each other and will enter judgment in favor of Wamsutter on this Count.

---

[109] *Id.* § 1.11.

[110] *See, e.g.*, Adv. D.I. 958 (Sept. 21, 2020 Tr. at 190:25-191-11 (testimony of Mr. Casey stating that he understands that the L63 MVC was tied to capital expenditures and ongoing cost of service)); Adv. D.I. 965 (Sept. 23, 2020 Tr. 126-37 (testimony of Mr. Bennett explaining, among other things, the development and calculation of a minimum volume commitment and the connection between the L63 G&P Fee and the L63 MVC)).

[111] *See, e.g.*, Ex. 189 & 203.

[112] Casey Declaration ¶ 35.

[113] *See, e.g. id.* ¶ 15 ("The construction of two of these compressor stations and related costs Williams incurred gave rise, in part, to the MVC payment obligation in the L63 Agreement"); *id.* ¶ 22 ("Williams refused to proceed without [the MVC provision].").

## C. Count 6 – Is the L63 MVC Unenforceable as an Unlawful Restraint on Alienation?

In Count 6, Southland seeks a ruling that, even if the L63 MVC is not severable, the Court should declare it void and unenforceable under Wyoming law as an unlawful restraint on alienation. Given the Court's conclusion that the L63 MVC is not a covenant running with the land, Southland agrees that this issue is moot.[114] The Committee, however, has asked this Court to eliminate the L63 MVC as a de facto, anti-assignment provision in violation of section 365(f)(1).[115]

Section 365(f)(1) provides that:

> Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such a contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

As explained by the United States Court of Appeals for the Third Circuit in *Haggen Holdings, LLC v. Antone Corp. (In re Haggen Holdings, LLC)*:

> "[s]ection 365(f)(1) was designed to prevent anti-alienation or other clauses in leases and executory contracts assumed by the Trustee from defeating his or her ability to realize the full value of the debtor's assets in a bankruptcy case." The plain language of § 365(f)(1) encompasses more than merely provisions that actually prohibit the assignment of an executory contract or an unexpired lease; the statutory provision also extends to any clause that "restricts, or conditions" such assignment.[116]

Notwithstanding, the Third Circuit has cautioned that the employment of section 365(f)(1) to waive or excise an agreed-upon contract or lease term should not be exercised lightly:

> Congress has suggested that the modification of a contracting party's rights is not to be taken lightly. Rather, a bankruptcy court

---

[114] *See* Adv. D.I. 258 (Oct. 23, 2020 Tr. at 118:5-12).

[115] Wamsutter argues that the Court cannot consider this argument. The Court disagrees. The Amended Complaint included this theory in Count 6. *See generally* Adv. D.I. 29 ¶¶ 94-95, 98, & 102. Moreover, it was raised in post-trial briefing and addressed at oral argument. By agreement, the parties forwent pre-trial briefing and submitted simultaneous post-trial briefing. The parties were given ample opportunity to address all arguments raised in the cross-briefing during a lengthy 3.5-hour oral argument held two weeks following post-trial submissions. Accordingly, the Court finds no prejudice to either party if it considers arguments fully developed for the first-time during briefing.

[116] 739 F. App'x 153, 156 (3d Cir. 2018) (quoting *In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1993)).

in authorizing assumptions and assignment of unexpired leases must
be sensitive to the rights of the non-debtor contracting party . . . and
the policy requiring that the non-debtor receive the full benefit of
his or her bargain.[117]

The Committee argues that the L63 MVC indirectly prevents a sale of the Wamsutter Assets because of "the risk that the buyer would be saddled for decades with an obligation to pay hundreds of millions of dollars for nothing in return."[118] However, that argument assumes that the L63 MVC is binding on future purchasers. It is not.[119] Perhaps the Committee believes that any sale of the Wamsutter Assets requires the assumption and assignment of the L63 Agreement or, even more simply, that its assumption and assignment would yield greater value to the estate. However, there is no evidence in the record supporting the importance of the L63 Agreement to a sale or the value differential. More importantly, it is not readily apparent that the L63 Agreement could be assumed and assigned without the L63 MVC under section 363(f)(1). The provision does not explicitly prohibit, restrict, or condition assignment of the L63 Agreement nor is it designed to impair Southland's ability to do. Rather, its purpose, when aggregated with the L63 G&P Fees and L63 Dedication, is to compensate Wamsutter. It is a material and economic term necessary for Wamsutter to realize the entire benefit of its bargain under the L63 Agreement; it was understood and accepted by all parties at the time of contracting; and the circumstances at hand appear distinguishable from those presented in the cases relied upon by the Committee.[120]

**D.**     *Count 8 – If the L63 Agreement is Rejected, May Southland Flow Its Gas Currently Serviced Under the L63 Agreement Gas Under the L60 Agreement?*

Count 8 explores what happens if Southland rejects the L63 Agreement and assumes the L60 Agreement. More specifically, Southland seeks a declaration that in such a scenario, it (or its successor) may flow – and Wamsutter must service – all gas subject to the L63 Agreement under the terms of the L60 Agreement. For the reasons set forth below, the Court finds in favor of Wamsutter on this issue and holds that Southland may not flow its gas in the Overlapping Area of

---

[117] *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1990) (citing *In re U.L. Radio Corp.*, 19 B.R. 537 (Bankr. S.D.N.Y. 1982); *accord In re Fleming Cos., Inc.*, 499 F.3d 300 (3d Cir. 2007) (refusing to invalidate a material and economically significant term made impossible to perform because of assignee's own decisions).

[118] *See* Adv. D.I. 219 at ¶ 32.

[119] *See* Section IV.A & E.

[120] *See Haggen Holdings, LLC v. Antone Corp. (In re Haggen Holdings, LLC)*, No. 15-11874, 2017 WL 3730527, at *8 (D. Del. Aug. 30, 2017) (affirming bankruptcy court's decision that a profit sharing provision in a commercial lease, requiring the debtor to pay the landlord 50% of the proceeds received from assignment, was an unenforceable anti-assignment provision, serving only to extract value that would otherwise accrue to the estates), *aff'd* 739 F. App'x 153; *In re Tousa, Inc.*, 393 B.R. 920 (Bankr. S.D. Fla. 2008) (invalidating price floor provision under Florida law as an unreasonable restraint on alienation); *In re Rickel Home Ctrs., Inc.*, 240 B.R. 826 (Bankr. D. Del. 1998) (striking a use restriction in shopping center lease because it made assignment impossible).

Interest currently serviced by Wamsutter under the L63 Agreement pursuant to the terms of the L60 Agreement if and when the L63 Agreement is rejected.[121]

Southland argued in connection with the earlier motion to dismiss that section 1.2 of the L60 Agreement contractually obligates Wamsutter to gather, process, and otherwise service all of Southland's gas that falls within the L60 Area of Interest, including that which is currently serviced under the L63 Agreement. The Court considered and rejected this argument, finding that the terms of the L60 Agreement do not require Wamsutter to service Southland's gas currently serviced under the L63 Agreement unless the L63 Receipt Points are also L60 Receipt Points or unless the parties agreed (or in the future, agree) to an amendment of the L60 Agreement to add the L63 Receipt Points as L60 Receipt Points.

No aforementioned amendment exists. However, Southland has argued that all L63 Receipt Points are L60 Receipt Points because the definition of "Receipt Point" under the L60 Agreement encompasses any receipt point that is a part of the Wamsutter Gathering System serving its gas within the L60 Area of Interest, which includes the L63 Area of Interest. This argument ignores other provisions of the L60 Agreement, the evolution of and interplay between the two Gas Gathering Agreements, and the parties' own interpretation and application of the agreements in the ordinary course. Receipt points under the respective Gas Gathering Agreements are distinct, must be agreed to by the parties and assigned to a specific contract, and cannot be unilaterally moved between contracts.

Although the parties defined "Receipt Point" in the L60 Agreement as "the upstream flange of the Gathering System to which an individual well or a central delivery point is connected where Shipper has a right, title or interest[,]"[122] they specifically identified the L60 Receipt Points in existence at the time of contracting on Exhibit C thereto.[123] They further addressed in the L60 Agreement how to add or remove them. L60 Receipt Points can be added through automatic amendments prescribed by sections 2.3 and 2.4 of the L60 Agreement, which arise when Wamsutter agrees to receive gas from newly drilled wells in the L60 Area of Interest or new gas that Southland acquires within the L60 Area of Interest.[124] More generally, L60 Receipt Points can be added (or removed) by written amendment of the L60 Agreement under section M.10.[125] Southland argues that the L60 Agreement does not address the current posited situation in which

---

[121] Nonetheless, if Southland drills a well or acquires gas in the Overlapping Area of Interest that is not subject to an L63 Receipt Point at the time of rejection, such gas may be subject to the terms L60 Agreement and Wamsutter's rights thereunder to accept or reject such gas. *See* Ex. 258 § 1.1(c) ("Gas produced from wells within the Dedication Area that are not connected to one of the Receipt Points listed (or becomes listed) in Exhibit A will be subject to the L60 Agreement.").

[122] Ex. 62, Ex. A at 3.

[123] *Id.*

[124] *Id.* §§ 2.3 & 2.4.

[125] *Id.*, Ex. A § M.10 ("Amendment. Unless expressly provided otherwise in this Agreement, this Agreement cannot be amended absent the change being in writing and signed by both Parties.").

existing wells and corresponding L63 Receipt Points are left without service under a rejected L63 Agreement, but the Court disagrees given the applicability of this general amendment provision.[126]

To date, there are approximately twenty-one distinct L63 Receipt Points and hundreds of L60 Receipt Points. Their designations are deliberate and meaningful. A receipt point is a common term used to designate the location where midstream providers connect their gathering systems to the wells and associated piping of upstream providers so that they can begin to perform services. Southland has attempted to minimize their importance. However, the terms of the Gas Gathering Agreements as well as reliable testimony make it clear that the L60 Receipt Points and the L63 Receipt Points are critical components of the Gas Gathering Agreements and the commercial understandings between the parties. They are the specific geographical markers (the proverbial "x that marks the spot") where Wamsutter must go and gather gas under the two Gas Gathering Agreements in the Overlapping Area of Interest. Indeed, the definition of "Gather" in the L60 Agreement, which serves as the foundation for Wamsutter's services, requires Wamsutter to receive Southland's gas only at the agreed upon L60 Receipt Points. Moreover, in circumstances like the ones presented, where there are gas gathering agreements with overlapping dedicated areas of interest, receipt points serve to designate the wells within the overlapping areas of interest subject to each agreement. They enable the parties to track the gathered gas before it enters the centralized gathering system and correctly apply it to its respective contract and commercial terms, including the calculation and attribution of any required fees.

In furtherance of these purposes, Anadarko and Wamsutter carefully delineated the then-existing L60 Receipt Points when formulating the L60 Agreement. Some of those receipt points were transferred to Southland in connection with the Anadarko-Southland transaction. L60 Receipt Points were then subsequently removed from or added to the agreement over the years, including in connection with the drilling of new wells, the Chain Lake Amendment, and the L63 Agreement. As explained, because the L60 Area of Interest and L63 Area of Interest overlapped, the parties agreed to give Southland the choice of which Gas Gathering Agreement would apply to gas produced in the L63 Area of Interest from future wells or later acquired gas. Once Southland made its decision, a receipt point was assigned and designated to either the L60 Agreement or the L63 Agreement. Wamsutter was then compensated for gas serviced from each receipt point pursuant to the applicable contract. Although Southland was incentivized to designate newly drilled wells in the Overlapping Area of Interest to the L63 Agreement to satisfy the L63 MVC, it was given the option to flow such gas under the terms of the L60 Agreement.[127] There is no evidence to suggest that this ever happened, but the terms of the L60 Agreement are clear that

---

[126] *See, e.g.*, *Amoco Prod. Co. v. EM Nominee P'ship Co.*, 2 P.3d 534, 540 (Wyo. 2000) ("[T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties." (internal citations omitted)); *see also Hunter v. Reece*, 253 P.3d 497, 503 (Wyo. 2011) ("courts 'are not at liberty to rescue parties from the consequences of their unwisely made bargains,' and we cannot rewrite the contract 'under the guise of judicial construction.' Rather, we must 'interpret contracts to effectuate the parties' intention, as expressed in the language of the agreement.'" (internal citations omitted)).

[127] Ex. 258 §§ 1.1(c) & 2.3.

Wamsutter is not obliged to accept such gas and could seek to renegotiate its fees in that circumstance.[128]

In sum, the terms of the Gas Gathering Agreements and the additional evidence adduced at trial indicates that the L63 Receipt Points are not the same as those of the L60 Agreement and cannot be unilaterally re-designated as L60 Receipt Points. An agreed upon, written amendment to the L60 Agreement is required before Wamsutter is obligated to service produced gas from those receipt points under the terms of that agreement.

### E. Count 13 – May Southland Sell the Wamsutter Assets Free and Clear of Wamsutter's Interests Therein?

In this final Count, Southland seeks a declaration that it may sell the Wamsutter Assets free and clear pursuant to section 363(f) of any interests of Wamsutter arising from the L63 Agreement. In support, it relies on subsections (1), (4), and (5) of such section.

Section 363(f) provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if -
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

The parties do not dispute that section 363(f) will enable Southland to sell the Wamsutter Assets free and clear if, as the Court has concluded, the L63 Agreement (or any part thereof) is not a real covenant. However, assuming *in arguendo* that it is a real covenant, the Court agrees with

---

[128] *See* Ex. 62 § 2.3 (discussing Wamsutter's right to accept or reject additional wells within the L60 Area of Interest); *id.* § 2.8 (contemplating future improvements of service, including infrastructure additions, and the corresponding re-negotiation of fees).

Southland that subsections (1) and (5) can nonetheless be satisfied, thus permitting a sale of the Wamsutter Assets free and clear of any Wamsutter interests arising from the L63 Agreement.[129]

As a threshold matter, the Third Circuit has held that the term "any interest in such property" as used in section 363(f) is intended to be broadly applied and "refer[s] to 'obligations that are connected to, or arise from, the property being sold.'"[130] As acknowledged by the United States Court of Appeals for the Fifth Circuit in *Newco Energy v. Energytec, Inc. (In re Energytec)* as well as many other courts tackling the subject, the focus under section 363(f) is not whether the relevant interest is a covenant running with the land but rather whether the particular qualifying circumstances set forth in subsections one through five can be satisfied with respect to the covenant.[131] The Court will follow the same analysis.

With respect to section 363(f)(1), Wyoming law allows a preexisting mortgage with priority over a later-created real property covenant to extinguish the covenant through foreclosure.[132] The purpose is to protect the mortgagee by ensuring that upon foreclosure, the mortgagee acquires exactly such title as the mortgagor owned at the time the mortgage was executed.[133] Wamsutter does not dispute Wyoming state law on this matter or the priority of the RBL Lenders' credit facilities or their foreclosure rights.[134] Rather, it argues that section 363(f)(1) does not permit Southland to stand in the shoes of the RBL Lenders and exercise their foreclosure

---

[129] Wamsutter argues that the Court cannot consider Southland's argument under section 363(f)(5) because it was not raised in the Amended Complaint. The Amended Complaint requests a declaration that Southland is entitled to sell its assets free and clear pursuant to section 363(f). *See generally* Adv. D.I. 29 ¶¶ 150-56. Southland included in the Amended Complaint its arguments under section 363(f)(1) and (f)(4) and raised in post-trial briefing its argument under section 363(f)(5). For reasons already set forth herein, *see supra* note 115, the Court finds no prejudice to either party if it considers Southland's section 363(f)(5) argument.

[130] *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003) (quoting *Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000)); *see also* 322 F.3d at 287 (agreeing that the phrase includes any interest that could potentially travel with the property being sold).

[131] 739 F.3d 215, 225-26 (5th Cir. 2013) (determining that rights to transportation fees and to consent to an assignment were covenants running with the land but remanded for a determination as to whether the interest could be sold free and clear under section 353(f)(5)); *see also In re Daufuskie Island Props, LLC*, 431 B.R. 626, 644-46 (Bankr. D. S.C. 2010) (analyzing whether section 363(f)(1)-(5) could be met with respect to restrictive covenant); *In re Dundee Equity Corp.*, No. 89-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) (same with respect to a covenant running with the land); *In re Metroplex on the Atlantic*, LLC, 545 B.R. 786 (Bankr. E.D.N.Y. 2016) (same with respect to an easement); *accord Mancuso v. Meadowbrook Mall Co. (In re Rest. Assocs., L.L.C.)*, No. 06-53, 2007 WL 951849 (N.D. W.V. 2007); *In re Signature Devs., Inc.*, 348 B.R. 758 (Bankr. E.D. Mich. 2006).

[132] *See Bush v. Duff*, 754 P.2d 159, 164 (Wyo. 1988), *overruled on other grounds by Ferguson Ranch Inc. v. Murphy*, 811 P.2d 287 (Wyo. 1991).

[133] *Id.* ("[T]he purchaser at the foreclosure sale acquires the title as it stood at the date of the mortgage." (quoting *Kling v. Ghilarducci*, 121 N.E.2d 752, 757 (Ill. 1954)).

[134] *See* Adv. D.I. 230 at ¶ 11 ("Wamsutter does not challenge the general principle that first-in-time, properly perfected lenders can foreclose and extinguish second-in-time real property covenants."); *id.* at ¶ 69 ("Wamsutter does not challenge in this proceeding the priority of the RBL lenders' credit facilities or their foreclosure rights.").

rights. It contends that section 363(f)(1) applies only to situations where the owner of the asset may, under non-bankruptcy law, sell the asset free and clear. However, section 363(f)(1) creates no such limitations. Its language is clear that Southland may sell property free and clear of any interest in such property held by a non-debtor "if applicable nonbankruptcy law" permits a sale free and clear. Accepting Wamsutter's interpretation would require the Court to rewrite section 363(f)(1) so that it provides that "[t]he trustee may sell property . . . free and clear of any interest in such property of an entity other than the estate . . . if . . . applicable nonbankruptcy law permits *[the trustee to sell]* ~~sale~~ of such property free and clear of such interest." This would not be appropriate for the Court to do.[135] Moreover, to not allow Southland to step into the shoes of the RBL Lenders to extinguish Wamsutter's interests would place Wamsutter in a better position than it would be outside of bankruptcy and encourage state law foreclosures and corresponding lift stay motions rather than the orderly process established by the Bankruptcy Code designed to maximize value for all stakeholders.[136] Although Wamsutter has cited cases in support of its position, the Court does not find them persuasive.[137]

With respect to section 363(f)(5), Southland argues that Wamsutter can be compelled to accept a money satisfaction of its interests in the Wamsutter Assets as a result of the L63 Agreement. The Court agrees. Under Wyoming law, "[i]t is well established that both legal and equitable remedies are available in covenant enforcement actions[.] 'Valid covenants, like other contracts and property interests, can be enforced and protected by both legal and equitable remedies as appropriate, without regard to the form of the transaction.'"[138] As explained by the RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES, courts have wide discretion to select an appropriate remedy to provide full and appropriate relief to an injured party and, in doing so, may consider the nature and purpose of the servitude as well as the transaction that created it.[139] Importantly, the L63 Agreement does not limit the remedies available in the event of a breach or exclude monetary damages.[140] Moreover, given that a purpose of the L63 Dedication is to ensure

---

[135] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) ("Our precedents make clear that the starting point for our analysis is the statutory text. And where, as here, the words of the statute are unambiguous, the "'judicial inquiry is complete.'" (internal citations omitted)).

[136] *Pinnacle Rest. at Big Sky, LLC v. CH SP Acquisitions, LLC (In re Spanish Peaks Holdings II, LLC)*, 872 F.3d 892, 900 (9th Cir. 2017) (holding that state foreclosure laws apply under 363(f)(1) because, if not bankruptcy, a foreclosure sale would likely have occurred and that would have allowed the extinguishment).

[137] *See Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696, 711 (S.D.N.Y. 2014) (holding section 363(f)(5) applicable only to those legal or equitable proceedings that could be brought by the trustee as owner of the property); *accord In re Jaussi*, 488 B.R. 456 (Bankr. D. Colo. 2013) (holding section 363(f)(5) applicable only when the owner of an asset may, under nonbankruptcy law, sell an asset free and clear); *In re S. Mfg. Grp., LLC*, No. 15-00931, 2016 WL 3344787 (Bankr. D. S.C. June 8, 2016) (same).

[138] *Essex Holding, LLC v. Basic Props., Inc.*, 427 P.3d 708, 724 (Wyo. 2018) (quoting 21 C.J.S. COVENANTS § 65 (2018)).

[139] *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 8.3(1) & cmt. b (2000).

[140] *See* Ex. 258, Ex. A § L (providing that, following completion of appropriate settlement negotiations, either Southland or Wamsutter may institute litigation to pursue any remedies available at law or equity); *see also Essex*, 427 P.3d at 724 (determining that monetary damages were appropriate for an anticipatory repudiation of an equitable servitude, highlighting the unlimited contractual remedies agreed to by the

the proper compensation of Wamsutter by way of the fees provided for in the L63 Agreement, monetary damages are an appropriate, calculable remedy.[141]

Finally, with respect to section 363(f)(4), this subsection will permit Southland to sell the Wamsutter Assets free and clear of Wamsutter's interests if there is an objective factual or legal dispute as to the validity of the interests.[142] "The goal of § 363(f)(4) is to allow the sale of property subject to dispute so that liquidation of the estate's assets need not be delayed while such disputes are being litigated."[143] Southland asserts that the issues addressed by the Court in this Opinion as well as in connection with Wamsutter's earlier motion to dismiss are subject to a good faith bona fide dispute given the parties' appeal rights.[144] Case law on section 363(f)(4) is sparse on the discrete issue of whether appeal rights create a bona fide dispute. However, the majority rule when interpreting the term "bona fide dispute" in the context of section 303 indicates that an unstayed judgment on appeal is not subject to a bona fide dispute.[145] No appeals have yet to be taken in this proceeding, let alone stayed. No party has briefed, and the Court will not prejudge, the likelihood of a future stay. Therefore, it does not decide whether section 363(f)(4) applies. Regardless, section 363(f)(1) and 363(f)(5) do apply, and the Court will enter judgment in favor of Southland on Count 13.

---

parties, and noting that the court cannot insert words into a contract but must give reasonable effect to the language of the parties expressed).

[141] *See, e.g.*, Ex. 258 § 1.11 (setting forth the mechanism of satisfying the L63 MVC in one lump sum).

[142] *In re Revel AC, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015); *Gorka v. Joseph (In re Atl. Gulf Cmtys. Corp.)*, 326 B.R. 294, 300 n.7 (Bankr. D. Del. 2005) (citing *Union Planters Bank, N.A. v. Burns (In re Gaylord Grain L.L.C.)*, 306 B.R. 624, 627 (8th Cir. BAP 2004) ("Clearly this standard does not require the court to resolve the underlying dispute, just to determine its existence.")).

[143] *See Daufuskie Island*, 431 B.R. at 645.

[144] *See id.* at 646 (finding appeal rights adequate to satisfy section 363(f)(4)).

[145] *In re Collins*, 180 B.R. 447, 542 (Bankr. E.D. Va. 1995) ("interpretations of bona fide dispute under § 303 have been illustrative"); *In re Drexler*, 56 B.R. 960, 967 (Bankr. S.D.N.Y. 1986) ("It would be contrary to the basic principles respecting, and would effect a radical alteration of, the long-standing enforceability of unstayed final judgments to hold that the pendency of the debtor's appeal created a "bona fide dispute" within the meaning of Code § 303."); *In re AMC Inv'rs., LLC*, 406 B.R. 478, 481 (Bankr. D. Del. 2009) ("[A] claim based upon a judgment, in the absence of a stay, is not subject to a bona fide dispute for purposes of determining whether a petitioning creditor is eligible to commence an involuntary petition."); *In re Marciano*, 459 B.R. 27, 54-55 (B.A.P. 9th Cir. 2011) ("Ultimately, . . . we conclude, consistent with the holding in *AMC Investors* and the majority of courts that have considered the issue . . . that an unstayed judgment, other than a default judgment, that is regular on its face, is in and of itself, sufficient to establish that the claim underlying the judgment is not in bona fide dispute.").

## V.    CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Southland on Counts 4 and 13 and in favor of Wamsutter on Counts 5, 6, and 8.  An appropriate order will follow.[146]

Dated:  November 13, 2020

_____
Karen B. Owens
United States Bankruptcy Judge

---

[146] In addition to post-trial briefing, Southland and Wamsutter each requested that certain witness testimony be stricken.  *See* Adv. D.I. 215 (requesting to strike certain testimony of Messrs. Bronson and Ceci); Adv. D.I. 216 (requesting to strike certain testimony of Messrs. Robbins, Pometti, and Casey).  The subject testimony was not relevant to the Court's findings and conclusions and therefore, the Court will deny the requests as moot.